**In re Mylo Adolph ANDERSON, Debtor.**

**Bankruptcy No. 83–05301.**

United States Bankruptcy Court, D. North Dakota.

July 19, 1985.

Max Rosenberg, Bismarck, N.D., for debtor.

Marvin Madsen, Minot, N.D., for Midwest Federal Sav. Bank.

Richard Olson, Minot, N.D., for Federal Land Bank and Norman Pederson.

Douglas Sletten, Garrison, N.D., for Garrison State Bank.

Robert Wheeler, Minot, N.D., for First Western Bank.

Jack McDonald, Jr., Bismarck, N.D., for Unsecured Creditors Committee.

Willliam Westphal, Minneapolis, Minn., U.S. Trustee.

ORDER

WILLIAM A. HILL, Bankruptcy Judge.

The issue presented to the Court is whether the Debtor's second Chapter 11 Plan filed on May 13, 1985, should be confirmed or whether, as a number of the creditors suggest, the Plan should be denied confirmation and the case dismissed.

On June 13, 1985, Midwest Federal Savings Bank, Federal Land Bank of St. Paul, Norman Pederson and First Western Bank filed a joint Motion for dismissal of the pending Chapter 11 case pursuant to section 1112(b) of the Bankruptcy Code. As reasons therefore, the movants cite a continuing loss and diminution of the estate, the Debtor's inability to effectuate a plan and unreasonable delay. On July 3, 1985, the Motion came on for hearing concurrent with a hearing on confirmation of the Debtor's Second Chapter 11 Plan. The Plan now under consideration is the second proposal, the first having been filed on January 23, 1984, and denied confirmation on February 11, 1985. Confirmation of the present Plan is resisted by the moving creditors who, in essence, believe the Plan is not feasible and likely to result in a further need for reorganization. Consideration of the issue is made upon the files and records of the case including testimony rendered at past confirmation and dismissal hearings and the information contained in the Debtor's previously approved Disclosure Statement.

1.

The Debtor filed for relief under Chapter 11 on May 27, 1983. A Plan and Disclosure Statement were filed in January of 1984, and the Disclosure Statement was approved on September 24, 1984. The Plan immediately met with substantial objections and was twice brought on for confirmation. At a December 17, 1984, hearing, the Debtor, believing that further negotiations and modifications were necessary, asked for a continuance which was granted. The original Plan was finally denied confirmation in February, 1985. At the February 11, 1985, hearing, the Debtor, citing the prospect of pending farm aid

legislation, asked for and was given an opportunity to prepare and file a second plan. The Plan now under consideration was filed as a consequence of this further opportunity. In the meantime, hearings were held on April 24 and May 13, 1985, to consider a joint dismissal Motion filed by the present movants on January 30, 1985. At each of the hearings above mentioned, the Debtor offered testimony either in support of his Plan or in resistance to the dismissal.

2.

The Debtor is a life-long farmer with a farm/ranch operation near Douglas, North Dakota. He farms 3,000 acres, 2,000 of which he owns and the remaining 1,000 acres being rented. Of his land, 1,200 acres are tillable with 700 acres of the rented land being tillable. Previously, the stay was lifted as against 960 acres of the Debtor's land upon which Federal Land Bank held a first mortgage and SBA held a second. These creditors have commenced foreclosure proceedings which, if completed without redemption, would leave the Debtor with 2,040 acres total.

In addition to farming, the Debtor runs a small cattle herd which varies in number due to periodic sales. As of July 3, 1985, he had 36 cows and 22 heifers. He projects selling 15 steers in 1986 and others in 1987. In past years, cattle sales have contributed as much as $30,000.00 to the overall farm income, but in 1982 the income from cattle sales was only $9,000.00, and in 1983 it was $8,000.00.

The total outstanding secured debt treated by the Plan, excluding the indebtedness to Federal Land Bank, SBA, and Midwest Federal (whose collateral is being returned), is $310,122.00, and unsecured debt treated by the Plan is approximately $57,-819.00. Under the terms of the Plan, the Debtor intends on continuing with his farm operation and ultimately pay his creditors 100% over the life of the Plan. In order to fund the Plan, the Debtor testified he will need approximately $80,000.00 the first year in addition to his yearly operational and living expenses which historically have been higher than what is now projected. The Plan itself divides the claims into eighteen classes and calls for declining payments over a period of twenty years. In the Plan's first year, total payments to creditors are $79,093.00 plus administrative expenses and taxes of $9,000.00 for a total first year payment of $88,093.00. In the second year, the total payment is $79,-093.00. In the fourth year, the total payment is $67,352.00, and in the fifth year, $60,732.00. In the sixth year, the total payment is $59,296.00, and in the seventh year, $46,035.00; and in the eighth year, $13,389.00. After ten years, the last remaining payments are to Class 12 in the sum of $7,638.92 per year continuing until the year 2005. His Disclosure Statement projects $93,400.00 as being available for debt repayment and, in testimony offered at the July 3, 1985, hearing, the Debtor stated his total income for 1985 is projected at $155,000.00. His Disclosure Statement projects future operating expenses to be $20,000.00 and family living expenses to be $15,000.00 for a total farm expense in the future of only $35,000.00. At the July 3 confirmation hearing, the Debtor elaborated on his projections specifically outlining his anticipated yields for the 1985 year—yields which he apparently believes are harbingers of future years under the Plan. Of his 2,000 acres, 380 acres are planted in wheat with 30 bushels per acre being the projected yield at $3.50 per bushel ($39,900.00); 275 acres are planted in barley with 45 bushels per acre being the projected yield at $2.00 per bushel ($24,-750.00); 130 acres are planted in flax with 10 bushels per acre being the projected yield at $6.00 per bushel ($7,800.00). He will in addition receive $16,500.00 from various crop programs. Of the 1,000 acres of rented land, 345 acres are in wheat ($36,-225.00); 110 acres are in flax ($6,600.00); and $7,800.00 will be received from government programs. It does not appear from the facts that these yield projections are based on the Debtor's historical production. The last time his farm operation averaged 30 bushels per acre in wheat was in 1962, and since then the average has been in the

area of 20 bushels per acre. Historical flax averages have been 8–9 bushels per acre, and historical barley averages have been 30 bushels per acre. At an April 24, 1985, hearing, the Debtor testified that his overall average yield was 23 bushels per acre and that in 1984 the actual yield was 8 bushels per acre. The Disclosure Statement reveals that in the years 1978 through 1982, his income from grain production alone averaged $34,000.00 with 1980 being the highest income year at $54,711.00. In 1984, his gross income was $98,000.00 which, after payment of a $55,000.00 operating loan, left him with a net income of $43,000.00. In 1983, his gross income was $67,463.00; 1982—$91,000.00; 1981—$60,000.00; 1980—$93,000.00; 1979—$49,000.00; and in 1978 it was $63,000.00. Over the past seven years, his average gross income from all sources has been $74,000.00.

At a May 13, 1985, hearing, the Debtor testified that 600 of the 960 acres now being foreclosed upon are crop acreage and if lost through foreclosure would represent 12,000 bushels of wheat or $42,000.00. The Debtor agreed, upon cross-examination, that with the loss of these acres there would be no way to maintain payments as projected. The previously approved Disclosure Statement anticipates the continued farming of all of his acreage including the 960 acres now being foreclosed. However, the recently filed Plan now under consideration seems to suggest that the Debtor has in his projections accounted for the loss of the 960 acres through foreclosure. This does not appear to be true upon consideration of the Debtor's testimony on May 13, 1985, where he stated that his Plan was based on retention of the 960 acres and if lost, the only way to maintain the payments as projected would be to obtain additional land or somehow change his operation.

In the Disclosure Statement, future operating expenses are projected at $20,000.00 per year and living expenses at $15,000.00. Historically, the total farm related expenses have been substantially higher. In 1985, the Debtor will need a $41,000.00 loan

from FHA in order to maintain his operation. He paid back a 1984 operating loan of $55,000.00. In 1982, the total farm expenses were $123,000.00; 1981—$88,000.00; 1980—$90,000.00; 1979—$46,000.00; and 1978—$46,000.00. There is nothing contained within the Disclosure Statement nor was there any testimony presented at any of the hearings suggesting a method whereby these historical operating expenses would be somehow reduced to the sums forecast for the future.

3.

The Motion for dismissal is premised principally upon the creditors' collective belief that the Plan is not feasible and that the Debtor is unable to effectuate a feasible plan, a belief which has been advanced at numerous hearings. The failure of a debtor to meet the confirmational prerequisite of 11 U.S.C. § 1129(a)(11) is cause for dismissal under section 1112(b) of the Bankruptcy Code. Section 1112(b) of the Bankruptcy Code provides that a 'pending Chapter 11 case may be dismissed for cause, including "(1) continuing loss to or diminution of the estate and absence of a reasonable likelihood of rehabilitation; (2) inability to effectuate a plan; (3) unreasonable delay by the debtor that is prejudicial to creditors ..." What constitutes cause for dismissal of a Chapter 11 case is a matter of judicial discretion under the circumstances of each case. A proposed plan of reorganization, however, may be confirmed only if all provisions of 11 U.S.C. § 1129(a) are met. Section 1129(a)(11) provides that the court shall determine that "[c]onfirmation of a plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan." 11 U.S.C. § 1129(a)(11). Thus, the Court must find that the plan of reorganization under consideration is feasible. The Eighth Circuit Court of Appeals has recently stated that:

"In determining whether [a plan] is feasible, the bankruptcy court has an obligation to scrutinize the plan carefully to

determine whether it offers a reasonable prospect of success and is workable." *In re Monnier Bros.*, 755 F.2d 1336, 1341 (8th Cir.1985) (citing *United Properties, Inc. v. Emporium Department Stores, Inc.*, 379 F.2d 55, 64 (8th Cir.1967)). The decision in *Monnier* confirms that the objective of any bankruptcy reorganization is to provide the best opportunity under the circumstances for payment of claims without jeopardizing vested interests in collateral. The Court cannot, in the present instance, find that the Debtor's Second Plan of Reorganization could be termed "workable". Nothing in the Debtor's testimony, Plan or Disclosure Statement affords the Court a basis upon which to place confidence in the Debtor's future income or expense projections. They are simply unrealistic when gauged against the historical figures. Furthermore, the Debtor has not done any projections in anticipation of the almost certain loss of 960 acres of his land. Even when possessed of all 3,000 acres, he has never over the last seven years even approached a gross income of $155,000.00. The Debtor himself acknowledged that his historical yield averages only 23 bushels per acre and that in 1984 it was 8 bushels. He testified that the loss of the 960 acres would take 600 crop producing acres out of production for a loss of 12,000 bushels or $42,000.00. If he is correct that 600 acres produces 12,000 bushels, this would break down to a per acre production of 20 bushels which is far closer to historical reality than his contrary projection of 30 bushels per acre and lends further weight to his earlier testimony of a historical yield average of 23 bushels per acre. For the 1985 crop year, the Debtor has a total of 1,240 acres in production which, if one uses the historical per acre yield average of 23 bushels per acre, will produce 28,520 bushels. When the 600 crop acres lost to foreclosure are subtracted, the average production available to the Debtor will be only 14,720 bushels rather than 36,520 bushels which would be the production if one used the Debtor's 1985 yield projections. The 1985 crop production projections are simply unsupported by the evidence.

The ethereal quality of the Debtor's proposed Plan is even more obvious when one plugs in the historical farm expense figures. Although the Debtor's Disclosure Statement places total future farm expenses at $35,000.00, in the past seven years the actual farm related expenses have been far in excess of this figure. Comparing the historical average annual income of $74,000.00 for the five-year period of 1978 through 1982 against the historical average annual farm related expenses for the same period of $78,993.00 reveals a historical average net loss of nearly $5,000.00 per year. In 1982, the actual loss for that year was $32,194.00. The Debtor has not explained either in his Disclosure Statement or through testimony at the various hearings how he intends to achieve such a dramatic reduction in farm related expenses over the ensuing years. He has not been able to operate at such a level during the pendency of the Chapter 11 proceedings, and there is no evidence suggesting he would be able to do so in the future. This case has been pending for two years, and during that time the Court has been careful to extend to the Debtor numerous opportunities with which to negotiate with creditors, modify existing plans and indeed even submit completely new plans. The Debtor's counsel himself, at the July 3 hearing, acknowledged that the chances of confirmation were slim. In fact, the Court must conclude that the Debtor's Second Plan filed May 13, 1985, is not feasible, and its confirmation must be denied. During the past two years, while the Debtor has been under the protection of Chapter 11, two Plans have been proposed and both have been denied confirmation which indicates to the Court a demonstrated inability to effectuate a plan. It appears, therefore, that "cause" for dismissal under section 1112(b)(2) exists.

Accordingly, and for the reasons stated,

IT IS ORDERED that confirmation of the Debtor's Second Plan is DENIED and the above-entitled case is DISMISSED ten days following entry of this Order unless

the Debtor should in the meantime convert to a Chapter 7.