**In re James Lee HOFF and Judy Frances Hoff, Debtors.**

**Bankruptcy No. 84–05117.**

United States Bankruptcy Court, D. North Dakota.

Oct. 31, 1985.

James Coles, Bismarck, N.D., for debtors.

Malcolm Brown, Mandan, N.D., for PCA.

Jerry Kettleson, Bismarck, N.D., for FmHA.

Max Rosenberg, Bismarck, N.D., for Rosenberg, Evans, Moench & Baird.

William Westphal, Minneapolis, Minn., U.S. trustee.

## ORDER

WILLIAM A. HILL, Bankruptcy Judge.

This matter is before the Court to consider confirmation of the Debtors' Amended Plan of Reorganization filed on May 29, 1985. Confirmation is opposed by Production Credit Association of Mandan, Farmers Home Administration and the law firm of Rosenberg, Evans, Moench & Baird for reasons as will later be discussed. On August 20, 1985, the Debtors filed an Application for confirmation pursuant to section 1129(b)(1), commonly termed the "cram down" provision.

Also pending before the Court is a Motion for Dismissal filed by PCA on May 20, 1985, alleging inability to effectuate a plan, unreasonable delay and continuing loss to the estate. The Amended Plan, as well as the Motion to Dismiss, came on for hearing on September 26, 1985, with consideration of the Motion taken under advisement pending determination of whether the Debtors' Amended Plan meets all confirmation requirements of section 1129.

The Debtors, James and Judy Hoff, have owned and operated a diversified farm and ranch near Leith, North Dakota, since 1958. They own or are purchasing under contract for deed 3,510 acres of land and in the past have leased 320 acres of land. The Debtors' farm income is supplemented by Judy Hoff's work as a life insurance representative.

The Debtors filed their Chapter 11 Petition on March 2, 1984, and have been attempting to reorganize for two crop seasons. During this time, the Debtors have been before the Court on a number of occasions, including four hearings for use of cash collateral, all of which were granted, and two previous motions to dismiss, both denied. The Debtors filed their initial Plan of Reorganization and Disclosure Statement on December 3, 1984. In addition to filing the Amended Plan of Reorga-

nization now being considered, the Debtors also filed an Amended Disclosure Statement on May 1, 1985, which was approved on May 15, 1985.

Fundamental economic conditions, including high interest rates, high inflation in previous years, and depressed prices for agricultural commodities, have contributed to the erosion of the Debtors' financial position. In addition, the Debtors were affected by a drought from 1979 through 1981. As a result of the drought, the Debtors bought feed for their cattle which further contributed to their financial problems. In 1982, the Debtors sold some cows to service their debt and were unable to obtain the necessary financing to purchase feeder cattle when their feed supplies were again replenished.

The Debtors' equity position had been declining for many years prior to bankruptcy. The Court realizes that a substantial portion of those years were drought years and, in arriving at a decision on the issues before it, will not give these figures undue weight. Based upon constant land valuations, the Debtor's equity percentage for the years preceding bankruptcy are as follows:

| November 30, 1978 | 35% |
| November 30, 1979 | 40% |
| November 30, 1980 | 38% |
| November 30, 1981 | 30% |
| October 13, 1982 | 26% |
| March 10, 1983 | 23% |
| March 15, 1984 | 16% |

During their first fiscal year in Chapter 11, the Debtors substantially devalued their land and machinery, so a bottom-line balance sheet or equity percentage analysis for that period would be of little value in measuring their progress or regress. A more valuable indicator of the trend of the Debtors' financial condition, the reasonableness of their Amended Disclosure Statement projections, and the feasibility of their Amended Plan is the change in their current asset figures from March 15, 1984 to March 1, 1985. Current assets on the Debtors' balance sheet include cash, home furnishings (remained constant), feed on hand, saleable crops, and livestock. The Debtors' current assets as of March 15, 1984, were $208,353.00 increasing to $222,570.00 by March 1, 1985, which is an increase of $14,217.00 in approximately one year. During that time, however, the Debtors were not burdened with interest, principal, or adequate protection payments with the possible exception of a $1,097.59 payment to PCA. Furthermore, these figures are not reflective of any decrease in machinery or land value due to depreciation which may have occurred. From a practical standpoint, $14,217.00 represents the amount that would have been available to pay creditors had the assets not been increased. The average proposed payments to creditors in the years 1986–1989, under the Amended Plan of Reorganization, as the Court has determined from the Amended Disclosure Statement, are approximately $72,000.00 per year, substantially more than the $14,217.00 which theoretically would have been available following the first fiscal year of bankruptcy.

Another useful barometer for analyzing the Debtors' financial condition and prospects of reorganization is their actual cash flow statement from the first fiscal year of bankruptcy and their projected cash flow statements for 1985 and 1986 as attached to the Amended Disclosure Statement and updated at the confirmation hearing. This information is useful despite a change in the accounting period which causes the 1985 cash flow statement to overlap with the last two months of the Debtors' cash flow statement for the first fiscal year of bankruptcy.

The Debtors' operating expenses for 1985 (actual through September and estimated thereafter), taken from the Debtors' revised cash flow as introduced at the confirmation hearing, appear to be approximately $9,000.00 less than the projected cash flow in the Amended Disclosure Statement. These figures are in line with the Debtors' historic expenses as set forth in their cash flow from March 15, 1984, to March 1, 1985, and are similar to those

projected in the Disclosure Statement for 1986. However, the Debtors' revised cash flow indicates that capital expenditures for 1985 will be approximately $30,000.00 greater than projected, causing total operating and capital expenses for 1985 to be approximately $20,000.00 greater than projected. The projected operating expenses therefore, appear realistic; but the Court questions the validity of the Debtors' projected capital expenditures for livestock during the years 1986–1989 as proposed in the Amended Plan.

The Debtors' income projections for 1985 appear, based upon their revised cash flow introduced at the hearing, to be close to the $304,950.00 actually projected. However, approximately one-third of that amount is still projected and *expected* to be realized in the ensuing months prior to January 1, 1986. Judy Hoff testified that an approximate shortfall of $20,000.00 in gross income projections could occur because of possibly making a marketing decision to hold $20,000.00 worth of cattle over until 1986. If this is done, the Debtors would realize income of approximately $284,154.00 for 1985. The approximate shortfall of $20,000.00 would be recovered in 1986 when the cattle are sold. Assuming that the Debtors do hold $20,000.00 worth of cattle over until 1986, their projections would leave them with $32,699.00 cash as of December 31, 1985, which the Debtors contend would be used to provide operating capital for 1986 and the Court concludes would also need to be used to pay administrative expenses if the Plan is confirmed.

The Debtors' projected and revised cumulative cash flow for the initial five years of the Amended Plan, as projected in the Amended Disclosure Statement, is as follows:

Five-Year Cash Flow
As Projected in Amended Disclosure Statement

|  | 1985 | 1986 | 1987 | 1988 | 1989 |
|---|---|---|---|---|---|
| Income | $304,950 | $310,279 | $310,279 | $310,279 | $310,279 |
| Oper. Exp. | (90,628) | (85,201) | (85,201) | (85,201) | (85,201) |
| Deprec./Mach. | (4,000) | (6,000) | (6,000) | (6,000) | (6,000) |
| Cattle Purchase | (138,000) | (138,000) | (138,000) | (138,000) | (138,000) |
| Balance | $ 72,322 | $ 81,078 | $ 81,078 | $ 81,078 | $ 81,078 |
| Debt Pymts. | (5,391) | (72,900) | (72,219) | (70,064) | (68,677) |
| Balance | $ 66,931 | $ 8,178 | $ 8,859 | $ 11,014 | $ 12,401 |
| Cumm. total | $ 66,931 | $ 75,109 | $ 83,968 | $ 94,982 | $107,383 |

The foregoing Disclosure Statement information was explained and supplemented by testimony of Judy Hoff who offered amended cash flow projections for 1985 and 1986. From her testimony, the Court arrived at the following calculations:

Five-Year Cash Flow
After Adjusted From
Revised Testimony At Confirmation Hearing

|  | 1985 | 1986 | 1987 | 1988 | 1989 |
|---|---|---|---|---|---|
| Income | $304,154 | $302,189 | $302,189 | $302,189 | $302,189 |
| Oper. Exp. | (81,724) | (84,422) | (85,201) | (85,201) | (85,201) |
| Deprec./Mach. |  | (6,000) | (6,000) | (6,000) | (6,000) |
| Cattle Purchase | (172,433) | (138,000) | (138,000) | (138,000) | (138,000) |
| Balance | $ 49,997 | $ 73,767 | $ 72,988 | $ 72,988 | $ 72,988 |
| Debt Pymts. | (5,391) | (72,900) | (72,219) | (70,064) | (68,677) |
| Balance | $ 44,606 | $ 867 | $ 769 | $ 2,924 | $ 4,311 |
| Cumm. Total | $ 44,606 | $ 45,473 | $ 46,242 | $ 49,166 | $ 53,477 |

After revising the 1985 figures, the cash flow, *if met*, would sustain payments as proposed under the Amended Plan.

The Debtors propose to finance their operation from the ongoing sale of crops and livestock in which PCA has a lien and to provide a replacement lien on any purchased livestock and growing crops to the extent of the lien on the property sold.

Following is a summary of the creditors' claims and the secured value of the claims:

| CREDITOR | TYPE OF SECURITY | SECURED CLAIM | UNSECURED CLAIM | TOTAL CLAIM |
|---|---|---|---|---|
| Grant County | | --- | $ 7,087.00 | $ 7,087.00 |
| John Deere | Combine | $ 1,177.00 | --- | 1,177.00 |
| Allen D. Hoff | 1st mortgage on land | 46,685.00 | --- | 46,685.00 |
| Bank of ND | 1st mortgage on land | 3,663.00 | --- | 3,663.00 |
| 1st Nat'l Bank | Automobile | 3,760.00 | --- | 3,760.00 |
| FmHA | 1st & 2nd mortgage on land | 240,578.00 | 112,745.00 | 353,323.00 |
| PCA | Livestock & machinery | 235,973.00 | 83,973.00 | 319,946.00 |
| PCA | Stock | 32,450.00 | --- | 32,450.00 |
| Unsecured creditors with claims exceeding $250.00 | | --- | 7,033.00 | 7,033.00 |
| Unsecured creditors with claims under $250.00 | | --- | 3,551.00 | 3,551.00 |
| Insiders | | --- | 6,811.00 | 6,811.00 |
| TOTALS | | $564,286.00 | $221,200.00 | $785,486.00 |

## CONCLUSIONS OF LAW

### I.

A proposed plan of reorganization must meet all requirements of section 1129(a) and cannot be confirmed without the approval of all impaired classes of creditors unless the plan is capable of "cram down" pursuant to section 1129(b) of the Code. 11 U.S.C. § 1129(a)(8) and (b)(1). Because of the objections of PCA and FmHA, both impaired creditors, the Debtors' only remaining option for confirmation is section 1129(b). A plan may be confirmed under section 1129(b) if the court determines that the plan does not discriminate unfairly, is fair and equitable with respect to each class of impaired claims or interests which have not accepted the plan, and all provisions of section 1129(a) except for paragraph (8) have been met. *See* 11 U.S.C. § 1129(b)(1). Before considering the elements of section 1129(b)(1) as applied to the instant Amended Plan, the Amended Plan will be measured first against the prerequisite provisions of section 1129(a)(1)–(11).

Section 1129(a)(1): The plan complies with the applicable provisions of this title.

Pursuant to this section, section 1122 regarding classification of claims or interests and section 1123 pertaining to content requirements of a plan must be complied with. Rosenberg's objection to separate classification of unsecured creditors, though perhaps well-founded, will not be addressed because the Amended Plan cannot be confirmed by a ballot confirmation with or without the unsecured creditors voting in one class. Also, both unsecured creditor classes, with the exception of the Insider's class, are treated identically under the Amended Plan so neither class is being preferred over the other.

Section 1129(a)(2): The proponent of the plan complies with the applicable provisions of this title.

As stated in Collier on Bankruptcy:

The principal purpose of section 1129(a)(2) is to require, as a condition of confirmation, that the court ascertain whether the proponent of the plan under consideration has complied with section

1125 of the Code with respect to solicitation of acceptances of its plan or rejections of any competing plan.

5 Collier on Bankruptcy § 1129.02[2] (1985).

The Court is satisfied that this requirement has been met.

Section 1129(a)(3): The plan has been proposed in good faith and not by any means forbidden by law.

No creditors object to the Amended Plan on the basis that it is not proposed in good faith. Without embarking on a thorough discussion of this issue, this Court is convinced that this element is met.

Section 1129(a)(4): Any payment made or to be made by the proponent, by the debtor, or by a person issuing securities or acquiring property under the plan, for services or for costs and expenses in or in connection with the case, or in connection with the plan and incident to the case, has been approved by, or is subject to the approval of, the court as reasonable.

No party has objected on the basis that this section is being violated, and the Court is aware of no information which indicates that this section is not complied with.

Section 1129(a)(5): (A)(i) The proponent of the plan has disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the plan, as a director, officer, or voting trustee of the debtor, an affiliate of the debtor participating in a joint plan with the debtor, or a successor to the debtor under the plan; and

(ii) The appointment to, or continuance in, such office of such individual, is consistent with the interests of creditors and equity security holders and with public policy; and

(B) The proponent of the plan has disclosed the identity of any insider that will be employed or retained by the reorganized debtor, and the nature of any compensation for such insider.

The Court is aware of nothing to indicate that this section is not being complied with.

Section 1129(a)(6): Any governmental regulatory commission with jurisdiction, after confirmation of the plan, over the rates of the debtor has approved any rate change provided for in the plan, or such rate change expressly conditioned on such approval.

The elements of this provision are not at issue in this case.

Section 1129(a)(7): With respect to each impaired class of claims or interests—

(A) each holder of a claim or interest of such class—

(i) has accepted the plan; or

(ii) will receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would receive or retain if the debtor were liquidated under Chapter 7 of this title on such date; or

(B) if section 1111(b)(2) of this title applies to the claims of such class, each holder of a claim of such class will receive or retain under the plan on account of such claim property of a value, as of the effective date of the plan, that is not less than the value of such holder's interest in the estate's interest in the property that secures such claims.

Rosenberg, apparently alluding to section 510(c), objected on the basis that the insiders should not receive payments under the Amended Plan until all other claims were paid. Rosenberg presented no evidence to convince the Court that the insider claims should be subordinated. Without considering the feasibility of the Amended Plan, the Amended Plan on its face does provide that all parties will receive more under the Amended Plan than they would under a liquidation. This section is, therefore, complied with.

Section 1129(a)(9): Except to the extent that the holder of a particular claim has agreed to a different treatment of such claim, the plan provides that—

(A) with respect to a claim of a kind specified in section 507(a)(1) or

507(a)(2) of this title, on the effective date of the plan, the holder of such claim will receive on account of such claim cash equal to the allowed amount of such claim;

(B) with respect to a class of claims of a kind specified in section 507(a)(3), 507(a)(4), or 507(a)(5) of this title, each holder of a claim of such class will receive—

(i) if such class has accepted the plan, deferred cash payments of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or

(ii) if such class has not accepted the plan, cash on the effective date of the plan equal to the allowed amount of such claim; and

(C) with respect to a claim of a kind specified in section 507(a)(6) of this title, the holder of such claim will receive on account of such claim deferred cash payments, over a period not exceeding six years after the date of assessment of such claim, of a value, as of the effective date of the plan, equal to the allowed amount of such claim.

The elements of this section, specifically the deferral of real estate tax claims, are complied with.

Section 1129(a)(10): If a class of claims is impaired under the plan, at least one class of claims that is impaired under the plan has accepted the plan, determined without including any acceptance of the plan by any insider.

This section is complied with as many secured and unsecured classes have accepted the Plan.

Section 1129(a)(11): Confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan.

This section is perhaps the most difficult for debtors to meet in obtaining confirmation of a plan of reorganization and is of critical importance in this case as it must also be considered in the context of PCA's Motion for Dismissal. The Debtors are to be commended on the effort and determination with which they have attempted reorganization. They have provided the Court with sufficient financial records and cash flow projections to thoroughly familiarize it with their operation. The Eighth Circuit, whose decisions are binding on this Court, recently set forth the standards to use in determining whether a plan is feasible and not likely to be followed by liquidation or further reorganization. The Eighth Circuit held that the "feasibility test is firmly rooted in predictions based on objective facts". *In re Clarkson*, 767 F.2d 417, 420 (8th Cir.1985). "Sincerity, honesty, and willingness are not sufficient to make the plan feasible, and neither are any visionary promises. The test is whether the things which are to be done after confirmation can be done as a practical matter under the facts." *Id.* (citing *In re Bergman*, 585 F.2d 1171, 1179 (2nd Cir.1978). "Pertinent factors to be considered include the business's earning power, the sufficiency of the capital structure, economic conditions, managerial efficiency, and whether the same management will continue to operate the company." *Id.*

■ PCA, in its objection to confirmation, contends that the predicted income in the Amended Plan and supporting Amended Disclosure Statement is unrealistic and in amounts never before attained by the Debtors in the history of their farming operation. Based upon the financial records available to the Court and the Eighth Circuit's requirement that projections be based upon "objective fact", we must agree with PCA. The Debtors' capital and operating expenses for 1985 will be approximately $20,000.00 in excess of their projection. The Debtors' cash flow for 1985, as adjusted from revised figures presented at trial, yields a surplus of $867.00, excluding the cumulative total of $45,473.00. If the Debtors' capital and operating expenses would again exceed projections by $20,000.00 in 1986, as they are

projected to in 1985, approximately one-half of the cumulative total would be depleted. Another $20,000.00 shortfall in the projected cash flow for 1987 would deplete most of the remaining cumulative balance. Based upon this shortfall alone, the Debtors would fail to meet their Plan obligation by 1988. If unforeseen expenses or additional shortfalls in the cash flow would occur, the Debtors could be forced into liquidation or further reorganization even earlier than 1987. As with any projection, there is a possibility that the Debtors' projections could be met. However, in view of the Eighth Circuit's standards, the predictions are not rooted in "objective fact", and section 1129(a)(11) is not met.

■ We now reach the issue of whether confirmation pursuant to section 1129(b) is possible in view of the remaining 1129(b) requirements. In addition to the requirement that confirmation of a plan pursuant to section 1129(b) meet the above requirements, it must not discriminate unfairly and it must be fair and equitable with regard to each impaired class of claims which has not accepted the plan. 11 U.S.C. § 1129(b). Section 1129(b) provides minimum requirements which must be met in determining if a plan is fair and equitable:

    (A) With respect to a class of secured claims, the plan provides—

        (i)(I) that the holders of such claims retain the liens securing such claims, whether the property subject to such liens is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims; and

        (II) that each holder of a claim of such class receive on account of such claim deferred cash payments totalling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property;

        (ii) for the sale, subject to section 363(k) of this title, of any property that is subject to the liens securing such claims, free and clear of such liens, with such liens to attach to the proceeds of such sale, and the treatment of such liens on proceeds under clause (i) or (iii) of this subparagraph; or

        (iii) for the realization by such holders of the indubitable equivalent of such claims.

11 U.S.C. § 1129(b)(2)(A).

PCA objects to the Debtors' Amended Plan of Reorganization on the basis that it is not fair and equitable to them. PCA, under the Amended Plan, would not be retaining a lien on all of their collateral. The Debtors contemplate selling livestock held as collateral by PCA and retaining the sale proceeds to meet operating and other expenses of 1986. Consequently, section 1129(b)(2)(A)(i) is not complied with under the terms of the Amended Plan because PCA is not retaining a lien on all of the property securing their claim.

If secured collateral is being disposed of by operation of a plan, a debtor may still comply with the fair and equitable treatment requirement by providing a creditor with a lien attaching to the proceeds of the creditor's collateral. The Amended Plan proposes to provide PCA with a replacement lien on any livestock purchased and crops grown to the extent of PCA's lien on the property sold. However, that lien must meet the indubitable equivalent requirement of 1129(b)(a)(A)(iii). "Such a substitute clearly must both compensate for present value and insure the safety of the principal". *In re Monnier Bros.*, 755 F.2d 1336, 1339 (8th Cir.1985) (citing *In re American Mariner Industries*, 734 F.2d 426, 433 (9th Cir.1984)). Though the present value of the principal would be compensated for by the proposed plan payments, the safety of the principal collateral would not be protected by a replacement lien in crops. Just one crop failure would leave PCA's interest in the secured collateral unprotected. Indubitable equivalence is a requirement under not only section 1129(b)(2)(A)(iii) but also under the section 361(3) adequate protection provision. In discussing "indubitable equivalence" in the

context of adequate protection, this Court has concluded that:

> [R]eplacement liens in 'hard assets' such as land or other minimally depreciable assets would be in most instances sufficient. However, ... a lien in a crop to be grown with all of the other *risks* attendant to that is not sufficient adequate protection except where a significant profit margin is very likely or a minimal guarantee of payment is proffered through crop insurance. To ask a creditor to release cash requires a strong likelihood of return. The uncertainties of the weather, crop prices, and all the other uncertainties inherent in farming increase the insecurity of a replacement lien solely in crops to be grown.

*In re Magnus*, 50 B.R. 241, 244 (Bankr.D. N.D.1985) (citing *In re Berens*, 41 B.R. 524 (Bankr.D.Minn.1984). Furthermore, we are bound by the District Court's holding that "a lien on crops not yet in existence ... is not the indubitable equivalent of a lien on already existing commodities in storage." *In re Berg*, 42 B.R. 335 (D.N.D. 1984), *remanded*, 761 F.2d 472 (1985) (consolidated on appeal as *In re Martin*). The Court must conclude that the indubitable equivalent requirement as required under either section 1129(b)(2)(A)(ii) and (iii) is not met, and accordingly the Amended Plan does not provide fair and equitable treatment to PCA as contemplated by the Eighth Circuit and the Bankruptcy Code.

As a matter of law, the Debtors' Amended Plan is not subject to cram down because the feasibility requirement of section 1129(a)(11) is not met and because the Amended Plan does not provide fair and equitable treatment to PCA.

## II.

### MOTION TO DISMISS

■ PCA filed their third Motion to Dismiss pursuant to 11 U.S.C. § 1112(b) on May 20, 1985. Section 1112(b) provides that the court may dismiss a case for cause including the following reasons which PCA has stated:

(1) continuing loss to or diminution of the estate in absence of a reasonable likelihood of rehabilitation;

(2) inability to effectuate a plan;

(3) unreasonable delay by the debtors that is prejudicial to creditors.

What might constitute cause for dismissing a Chapter 11 reorganization proceeding is a matter of judicial discretion to be determined upon consideration of the circumstances of each case. *In re Galvin*, 49 B.R. 665, 668 (Bankr.D.N.D.1985).

■ The facts of this case, as outlined and discussed above in the context of sections 1129(a)(11) and 1129(b), established sufficient cause for dismissing the case. The Debtors have been afforded protection of the Bankruptcy Code for almost 20 months. During this time, the Debtors have submitted two Plans and two Disclosure Statements. The Debtors have been unable to obtain confirmation of any of the proposed Plans of Reorganization which have been filed with the Court. The Court believes that the Debtors have been given sufficient opportunity to attempt a reorganization. Despite the Debtors' efforts and determination in reorganizing their operation, they are limited to working with the facts, figures, and market conditions as they have existed and are projected to exist. The Bankruptcy Code does not guarantee successful reorganization of every debtor; it only provides them with a breathing period during which time they can attempt to reorganize their financial condition. The Debtors have been unable to meet their cash flow projection for 1985, and they project gross income for the years from 1985 through 1989 which exceeds what they have ever realized before. Even by "writing off" much of their secured debt and paying back the unsecured amount at a greatly reduced value, the Debtors simply do not have the gross income capabilities within their farm and ranch operation to propose a feasible plan of reorganization. In the meantime, large partially secured creditors such as PCA and FmHA are sitting by and foregoing any interest or principal payments on their

collateral. Based upon the Debtors' inability to effectuate a plan and the prejudicial delay to creditors which has now approached the point of being unreasonable, the Court cannot allow this case to remain open any longer. The Hoffs, though optimistic and determined, must at some point accept the reality of their financial circumstances. That point has now come. Accordingly, and for the reasons stated herein,

IT IS HEREBY ORDERED that confirmation of the Debtors' Plan of Reorganization is DENIED, and the above-entitled case be and is hereby DISMISSED ten days following entry of this Order.