In re Loye A. ASHTON, Debtor.

Bankruptcy No. 88–05547.

United States Bankruptcy Court,
D. North Dakota.

Aug. 4, 1989.

Phillip D. Armstrong, Minot, N.D., for debtor.

Richard Olson, Minot, N.D., for First Nat. Bank of Williston.

David Hogue, Minot, N.D., for FDIC.

## MEMORANDUM AND ORDER

WILLIAM A. HILL, Bankruptcy Judge.

This case is before the court on a motion by First National Bank of Williston seeking conversion of the Debtor's pending Chapter 11 to a Chapter 7. The Motion, filed on May 12, 1989, came on the heels of a May 9, 1989, hearing wherein the court denied an earlier motion by the bank for conversion. The renewed motion has been joined in by Midwest Federal Savings and Loan and the Federal Deposit Insurance Corporation (FDIC). A hearing was held before the undersigned on June 26, 1989.

First National takes the position that under the facts the Debtor's plan cannot overcome section 1129(b)(2)(B)(ii) commonly referred to as the "absolute priority rule" and even if overcome, the plan is premised upon unrealistic income projections.

The facts as relevant to the issue are gleaned from the Debtor's petition, the several disclosure statements and plans on file as well as testimony taken at hearings held in January 1989, May 1989, and June 1989.

### Findings of Fact

1.

The Debtor is a dentist who, in addition to maintaining a dental practice in Williston, North Dakota, is involved in a variety of real estate and other ventures including an environmental research firm known as Deucalion Research, Inc. A petition was filed under Chapter 11 on July 5, 1988, listing assets of $1,632,264.00 and liabilities of $1,836,554.00. Included among the assets were twelve parcels of real property valued at $634,000.00, coin collections worth $50,000.00, vehicles worth $70,000.00, dental equipment worth $25,000.00, dental patient charts worth $24,000.00, accounts receivables of $28,000.00, a claim against First National Bank of Williston valued at $200,000.00 and stock in Deucalion Research valued at $569,000.00.

Since the filing, relief from stay has been accorded the bank on six parcels of real estate as well as various vehicles and equipment. Midwest Federal Savings and Loan has also obtained relief from stay as regards a mobile home and FDIC has obtained relief from stay on a coin collection and several vehicles.

A disclosure statement and plan were first filed on March 27, 1989, and were subsequently amended on May 4, 1989. The disclosure statement came on for consideration on May 9, 1989, and was found to be deficient in various respects which prompted a second modified disclosure statement along with second modified plan to be filed on June 26, 1989. As now proposed, the Debtor states he is surrendering substantially all of his real estate holdings as well as all other non-exempt personal property and will depend primarily upon income from his dental practice and Deucalion Research to fund the plan.

In the past the Debtor has grossed $7,000.00 to $8,000.00 per month from his dental practice but states this is not truly reflective of the practice's income potential since in the past his time has been divided between dentistry and the research company. It is his belief that by committing fifty hours per week to the practice of dentistry he will be able to generate $17,000.00 per month. At a prior hearing he testified that dental income in excess of $20,000.00 per month could be possible but then agreed that this figure included income from Deucalion Research. In the second amended disclosure statement he states he will be receiving $3,000.00 per month from Deucalion in payment for his consulting work.

In 1984 and 1985 the dental practice suffered net losses but in 1987 it generated income of $23,000.00 for the year. Annual gross revenues for 1984 through 1987 average $106,000.00 or $8,800.00 per month. Net revenues for the same period averaged $2,190.00 per year. No separate net revenue figures derived from the dental practice are provided for 1988 but when compiled with $22,579.00 of earnings from Deucalion Research, the Debtor generated gross income of $113,261.00 in 1988. Of this, $90,682.00 was derived solely from dental services. Annual net income from these two sources was $68,060.00 in 1988 or $5,671.00 per month on the average. Through May 1989, the Debtor has generated $40,029.00 from his dental practice and has received $5,465.00 from Deucalion for a gross of $45,495.00. Net income for the five month period was $22,078.00 which averages to $4,415.00 per month. The following tables more clearly contrast the income data:

### 17 month income average from all sources

| 1988 monthly net | 1989 monthly net for 5 mos. | 17 month average | Projected monthly net | Percentage Increase Over Average |
|---|---|---|---|---|
| 5,671 | 4,415 | 5,043 | 20,000 | 400% |

### 65 month income average from dental practice only

| 1984 | 1985 | 1986 | 1987 | 1988 | 1989 mo. net for 5 months | 65 month average | Projected Monthly Net | Percentage Increase Over Average |
|---|---|---|---|---|---|---|---|---|
| −1,770 | −693 | 1,225 | 1,969 | 3,790 | 1,384 | 5,905 | 17,000 | 289% |

Deucalion Research, Inc. was founded in 1983 by the Debtor who formerly served as its president and chairman of the board. At the present time, however, he holds no office with the company and has no employment contract with it but remains the owner of over 55,427,350 shares of the company's stock. He testified at an earlier hearing that he receives $4,500.00 per month from Deucalion. However, in 1988 he received income from that company for only six months and for two of these the amount received was less than $4,000.00. In the first five months of 1989 he received income from Deucalion for two months totalling $5,465.00 in the aggregate. Despite the lack of an employment contract and the realities of the company's past performance, the Debtor's plan relies on income of $3,000.00 per month in consequence of consulting work for the company.

If $3,000.00 per month can be reliably counted on from Deucalion Research it doubtless will require, as it has in the past, a substantial devotion of time on the part of the Debtor—recalling that in the past his time has been divided equally between the dental practice and Deucalion pursuits. If so, then it is difficult to see how 50 hours per week can be dedicated exclusively to dental practice. According to the disclosure statement, the Debtor is presently committing 30 hours per week to the dental practice. Presumably, based upon his earlier testimony that he splits his time equally between the practice and Deucalion, this means that in the past 30 hours per week has also been spent on Deucalion tasks. In all likelihood consistent Deucalion income of $3,000.00 per month will require at least 30 hours or so of work which, on top of the 50 hours being dedicated to the dental practice means consistent 80 hour work weeks over the plan term. This translates into 16 hour days assuming a 5 day work week—8:00 a.m. to 12:00 p.m. Monday through Friday with no break for lunch or dinner. This strikes the court as an extremely unlikely scenario.

It is difficult to ascertain the relative health of Deucalion Research, Inc. and its ability to pay the $3,000.00 per month on a regular basis. The Debtor holds 55,427,350 shares of its stock which has an uncertain market value. According to the schedules, the plan and the Debtor's testimony it is worth 2/10 of a cent per share which would give his holdings a value of $110,854.00. The petition schedules, however, value the stock at $569,000.00 and at one point the Debtor testified it was worth $140,000.00 if it could be sold. While listed on the over-the-counter market, the stock is not being traded at the present time and in the plan liquidation analysis it is assigned no liquidation value at all.

2.

The Debtor's plan is comprised of eleven classes inclusive of administrative, priority, secured and unsecured claims. According to the plan the Debtor has an administrative obligation of $4,000.00, an IRS tax liability of $95,645.00 which will be paid at the annual rate of $16,240.00. Secured claimants are American State Bank and Trust with a claim of $70,000.00 to be paid at the rate of $990.00 per month and FDIC with a claim of $229,150.00 which will be reduced to $188,150.00 by collateral surrender[1]. The $188,150.00 balance is secured by Deucalion stock and a wage assignment, the validity of which are being challenged. If the challenge is successful the balance will be unsecured and if unsuccessful it will have to be treated as a secured debt.

According to the plan unsecured debt ranges from a high of $1,395,940.00 to a low of $948,071.00 depending upon the status of FDIC's claim and a partial challenge to the claim of First National Bank. Under Class 11 the unsecureds will be paid ten percent over five years which translates to a range of $139,594.00 to $94,807.00 payable over five years at from $2,326.00 to $1,580.00 per month with no interest.

3.

As proposed the Debtor will retain dental equipment, inventory, accounts receivables and patient charts worth $77,000.00, a building worth $20,000.00, equity in a computer system, lawsuit proceeds of undetermined value, Deucalion stock worth between $110,000.00 and $554,000.00, Montana real estate worth $25,000.00 and an antique automobile worth $12,500.00.

*Conclusions of Law*

1.

First National Bank as the largest unsecured creditor has consistently stated that it will not vote in favor of the plan. Consequently, the only way the Debtor's plan can be confirmed over the objection of the bank, which is an impaired class, is through the cram-down provisions of section 1129(b). 1129(b) requires that a plan be "fair and equitable" to a descending class of unsecured creditors. Among the specific requirements are the following:

(B) With respect to a class of unsecured claims—

(i) the plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or

(ii) the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property.

From the foregoing statutory provision, a plan can be confirmed over the objection of a dissenting class of unsecureds only if one of two alternatives is satisfied. The first is not applicable to the facts at bar because the Debtor proposes paying the unsecureds only ten percent of their respective claims. This leaves the Debtor with meeting the second requirement which is commonly known as the "absolute priority rule". The absolute priority rule in its simplest terms requires that creditors of a debtor in bankruptcy reorganization receive payment of their claims in their established priority, and that they receive payment in full be-

---

1. The Debtor proposes surrendering a $25,000.00 coin collection, $16,000.00 worth of automobiles, and 192 ounces of silver bullion which is not listed in the schedules and at this point is unvalued.

fore lesser interests—such as those of equity holders—may share in the assets of the reorganized entity. Powlen and Wuhrman, *The New Value Exception to the Absolute Priority Rule, Is Ahlers the Beginning of the End?*, 93 Com.L.J. 303, no. 3 (Fall 1988). The United States Supreme Court in the seminal case of *Norwest Bank Worthington et al v. Ahlers*, 485 U.S. 197, 108 S.Ct. 963, 99 L.Ed.2d 169 (1988) affirmed the vitality of the absolute priority rule holding "under current law, no Chapter 11 reorganization plan can be confirmed over the creditors' legitimate objections if it fails to comply with the absolute priority rule". 108 S.Ct. at 966.

■ In the case at bar the Debtor not only is not paying the unsecureds in full but is also proposing to retain exempt as well as non-exempt assets of considerable value. Section 1129(b)(2)(B)(ii) says that a debtor may not retain any property without qualification. There is no distinction between exempt and non-exempt property. Furthermore, any argument that the Deucalion stock or other retained assets have minimal or zero liquidation value is irrelevant. In *Ahlers* the Supreme Court expressly rejected the "no value" theory holding that "even where debts far exceed the current value of assets, a debtor who retains his equity interest in the enterprise retains property." 108 S.Ct. at 969. Moreover, as expressed by one court, it is illogical to believe a debtor would retain property that has no value. *Matter of Yasparro*, 100 B.R. 91 (Bankr.M.D.Fla.1989).

■ The Debtor's second modified plan unquestionably fails to meet the requirements of section 1129(b)(2)(B)(ii). The only exception to the absolute priority rule aside from complete payment of the unsecured class is an infusion of new capital—known as the "new value" exception. *See Case v. Los Angeles Lumber Products Co.*, 308 U.S. 106, 121–22, 60 S.Ct. 1, 10, 84 L.Ed. 110 (1939). The consideration required must be substantial and must take the form of money or money's worth. 308 U.S. at 122, 60 S.Ct. at 11. The Debtor's plan as presently proposed makes no proposal for contributions of new capital, however, by

motion filed July 10, 1989, the Debtor requests leave to file yet a third modification for the reason that concededly the second modified plan cannot overcome the objection based upon the absolute priority rule. In the brief in support of his motion the Debtor suggests he will contribute new capital of $40,000.00 for immediate payment of unsecureds. From the previous discussion regarding infusions of new capital, a third modified plan providing for cash infusion of $40,000.00 will not be sufficient. The total unsecured debt is at least $948,-000.00 and a $40,000.00 cash contribution is not "substantial". A substantial contribution means to retain property to the exclusion of the unsecureds the contribution must at least equal the interest being retained. *Matter of Stegall*, 865 F.2d 140 (7th Cir.1989). The proposal to contribute $40,000.00 will simply not pass muster.

It appears to the court that even in acknowledging a possible $40,000.00 cash contribution that no plan has been or will be proposed that can achieve confirmation (assuming the Debtor continues in his desire to retain assets).

### 2.

The foregoing concerns regarding the Debtor's ability, after three tries, to yet meet the requirements of section 1129(b)(2)(B)(ii) logically brings into question the matter of feasibility generally. Under section 1129(a)(11) a plan must be feasible, that is that it is not likely to be followed by liquidation or the need for further reorganization. In *In re Clarkson*, 767 F.2d 417, 420 (8th Cir.1985) the Circuit held the test of feasibility to be:

"... Whether the things which are to be done after confirmation can be done as a practical matter under the facts (citations omitted) pertinent factors to be considered include the business' earning power, the sufficiency of the capital structure, economic conditions, managerial efficiency, and whether the same management will continue to operate the company."

In the same case the court said feasibility must be rooted in predictions based upon objective fact. *See also, In re Fenske*, 96

B.R. 244 (Bankr.D.N.D.1988); *In re Konzak,* 78 B.R. 990 (Bankr.D.N.D.1987); *In re Hoff,* 54 B.R. 746 (Bankr.D.N.D.1985); *In re Anderson,* 52 B.R. 159 (Bankr.D.N.D.1985).

██ The plan as present constituted does not meet the absolute priority rule requirements and it does not appear as a practical matter, that the Debtor can realistically be expected to either pay off the unsecured creditors or provide significant cash infusions. His earnings projections of $20,000.00 net per month are considerably higher than historical data suggests and, in part, are based upon income from Deucalion—a source which is at best uncertain. It is also based upon a nearly impossible time commitment which as stated earlier strikes the court as unrealistic.

The Debtor has been under the protection of Chapter 11 for over one year during which time three plans have been proposed. This court has on several occasions expressed its concern over whether any plan proposed could meet the requirements of the absolute priority rule. This concern has not been alleviated but rather has only been heightened by the passage of time, the Debtor's professed desire to retain certain of his assets and the unrealistic income projections. Section 1112(a) provides for the conversion or dismissal of a case where there is an inability to effectuate a plan. Under the facts as outlined herein there does appear to be a consummate inability on the part of the Debtor to achieve a reorganization that will comport with the requirements of section 1129. Accordingly, it is appropriate that the case be converted to a Chapter 7.

Consistent with the foregoing, IT IS ORDERED that the Debtor's Chapter 11 case be herewith converted to a Chapter 7.

SO ORDERED.