**In the Matter of H. Dean STEGALL and Sandra Lorene Stegall, Debtors–Appellants.**

**Appeal of The FEDERAL LAND BANK OF ST. LOUIS, Appellee.**

**No. 87–2060.**

United States Court of Appeals, Seventh Circuit.

Argued Sept. 29, 1988.

Decided Jan. 5, 1989.

---

11 of the Bankruptcy Code. Their filing disclosed $650,000 in liabilities and only $208,000 in assets. They proposed a plan of reorganization under which they would retain the farm, would continue paying interest to their secured creditors, and would pay their unsecured creditors a total of 10 percent of their debt to them over the next ten years (1 percent a year for ten years), without interest. The Federal Land Bank of St. Louis—a principal source of farm credit and a frequent party to bankruptcy proceedings—was the Stegalls' principal secured and unsecured creditor. It was unsecured to the extent—which was considerable—that the bank's loans to the Stegalls exceeded the value of the land and other property that secured the loans. The bank refused to approve the Stegalls' plan of reorganization. Because the bank held more than one-third of the Stegalls' unsecured debt, the plan could be confirmed over its opposition only if the bankruptcy judge employed Chapter 11's "cram-down" provision. See 11 U.S.C. §§ 1126(c), 1129(a)(8), 1129(b)(1). He could do that only if the plan was "fair and equitable," which he could find it to be only if the plan gave the unsecured creditors an interest in the bankrupt estate equal to the full amount of their claim, before the debtors (who of course are junior to the unsecured creditors) received any interest in the estate—in other words, only if the unsecured creditors were given absolute priority over the debtors. 11 U.S.C. § 1129(b)(2)(B). The Stegalls' plan did not do that: it promised the unsecured creditors only a fraction of their claims, as we have seen.

But there is a judge-made exception to the absolute-priority rule: the debtor can retain an interest in the bankrupt estate ahead of his creditors to the extent that he puts new capital into the estate. So if he contributes $50,000 in cash to the bankrupt enterprise, he can retain an interest worth $50,000 (more precisely, the bankruptcy judge can force a plan providing for such retention on protesting creditors) even if the plan of reorganization fails to give a class of creditors an interest in the bankrupt estate equal in value to those credi-

Barry M. Barash, Barash, Stoerzbach & Henson, P.C., Galesburg, Ill., for debtors-appellants.

Douglas R. Lindstrom, West Neagle & Williamson, Galesburg, Ill., for appellee.

Before BAUER, Chief Judge, and POSNER and COFFEY, Circuit Judges.

POSNER, Circuit Judge.

The Stegalls own and operate a farm that went belly-up during the recent midwestern farm troubles. In 1985 they filed a petition for reorganization under Chapter

tors' claims. See *Case v. Los Angeles Lumber Products Co.*, 308 U.S. 106, 121–22, 60 S.Ct. 1, 10–11, 84 L.Ed. 110 (1939); *Kansas City Terminal Ry. v. Central Union Trust Co.*, 271 U.S. 445, 455, 46 S.Ct. 549, 551, 70 L.Ed. 1028 (1926). The Stegalls claim that their plan fit within this exception. The bankruptcy judge disagreed, and rejected the plan. 64 B.R. 296 (Bankr.C.D.Ill.1986). The district court affirmed, 85 B.R. 510 (C.D.Ill.1987); the Stegalls appeal.

■ The "fresh capital" exception to the absolute-priority rule pre-dates the Bankruptcy Code of 1978; does it survive it? We assumed so without discussion of the question in *In re Potter Material Service, Inc.*, 781 F.2d 99, 101 (7th Cir.1986). *In re U.S. Truck Co.*, 800 F.2d 581, 588 (6th Cir.1986), similarly assumes without discussion that the exception survived the Code. The Solicitor General's amicus curiae brief in *Norwest Bank Worthington v. Ahlers*, No. 86–958, O.T.1987, at pp. 17–23 (filed Aug. 6, 1987), argued that this is wrong, pointing out that the Code codifies the exceptions to the absolute-priority rule and that the fresh-capital exception is not in the list. See also H.R.Rep. No. 595, 95th Cong., 1st Sess. 413–14 (1977). U.S.Code Cong. & Admin.News 1978, p. 5787. The Solicitor General noted that creditors are better judges of what is in their self-interest than bankruptcy judges, so if most or at least a substantial minority of creditors (weighted by debt) are not impressed by the debtor's proposal to infuse new capital into the sinking enterprise, that ought to be the end of it. See also Baird & Jackson, *Bargaining After the Fall and the Contours of the Absolute Priority Rule*, 55 U.Chi.L.Rev. 738, 746 n. 23, 757 n. 48 (1988). The Supreme Court declined the Solicitor General's invitation to resolve the issue. *Norwest Bank Worthington v. Ahlers*, —— U.S. ——, 108 S.Ct. 963, 967 n. 3, 99 L.Ed.2d 169 (1988). No more need we try to resolve it today, since this case, like *Ahlers*, is not within the fresh-capital exception even if that exception survived the enactment of the 1978 code. We emphasize, however, that the issue is an open one in this circuit, *Potter* notwithstanding. A point of law merely assumed in an opinion, not discussed, is not authoritative. See, e.g., *Pennhurst State School & Hospital v. Halderman*, 465 U.S. 89, 119 and n. 29, 104 S.Ct. 900, 918 and n. 29, 79 L.Ed.2d 67 (1984); *United States v. Kucik*, 844 F.2d 493, 498 (7th Cir.1988); *United States v. Crawley*, 837 F.2d 291, 293 (7th Cir.1988).

■ The principal contribution that the Stegalls offered to make, in their plan of reorganization, was their labor in working the farm. The bankruptcy judge refused to credit this contribution, anticipating the Supreme Court's holding in *Ahlers* (see 108 S.Ct. at 967–68) that "sweat equity" is not within the scope of the fresh-capital exception. Since the Thirteenth Amendment forbids specifically enforcing a promise of work against a person who has no money, the Federal Land Bank of St. Louis cannot seize the Stegalls if they default; therefore that promise is not a leviable asset. Yet it is being offered in place of leviable assets —the land and other property of the farm. The lack of equivalence is practical as well as legal. Here as in most "sweat equity" cases the debtors want to be allowed to keep their business in exchange for promising to operate the business and give the creditors a share of the income generated by the operations. If the debtors should default—the likeliest outcome in a Chapter 11 case, for most such cases are eventually converted to Chapter 7 (liquidation) cases— the creditors will be right back where they were before the reorganization was approved, and they will have to institute new proceedings to recover the money owed them. Only they will be owed less because the reorganization will have transformed their claims into an interest smaller than the full value of those claims. These are salami tactics: first the debtor slices off 90 percent of the unsecured debt; then he defaults on the remaining 10 percent and slices that off too.

■ The Stegalls do not stake their whole case on "sweat equity," or more precisely post-confirmation sweat equity, the issue in *Ahlers*. As they correctly note, if before the plan is confirmed the

debtor through the sweat of his brow creates value—a crop, let us say—and contributes it to the bankrupt estate (net, of course, of any wages that the debtor receives from the estate), that value qualifies for the new-capital exception (always assuming that the exception survived the enactment of the Bankruptcy Code of 1978). The source of the value is irrelevant; the point is that it be a solid asset, rather than just a promise of future labor. In the period between the filing of the petition for reorganization and the decision by the bankruptcy judge on the Stegalls' plan, the Stegalls borrowed $15,000 to plant and reap crops on their land. The crops (along with government support payments to which the Stegalls would be entitled for growing them) were to be the security for the loan. The Stegalls' plan of reorganization proposed to contribute the crops, which they value (together with the support payments) at $22,000, to the bankrupt estate, along with other assets that they say are worth a considerable amount; but only $2,000 of these additional assets are actually valued in the plan, the principal such asset being a car worth at least $931 but perhaps not much more. One hundred pigs are mentioned, but we are unable to determine whether they are actually part of the plan or what they are worth. The Stegalls seek our advice on what to do about capital contributions that are difficult to quantify (although why pigs should defy valuation escapes us), but that question would be ripe only if their plan of reorganization had made a stab at valuation, and it did not. But it did not in part because (they argue) even if the total contribution is only $24,000, this is more than they propose to take out of the bankrupt estate by retaining the farm. Indeed, it is more than $24,000 more, because the farm has a negative net worth to anyone except the Stegalls, to whom it has sentimental value and provides employment close to home. They conclude that if their plan were accepted the unsecured creditors would be better off to the tune of $24,000 (give or take a few pigs).

The figure is doubtful, despite the pigs and other unvalued (although not value-less) items, because the Stegalls have failed to deduct from the value of the crops the $15,000 that they borrowed to plant them. Indeed, the whole $22,000 figure may be spurious, as we are about to see. And it is hard to understand how the farm could have a *negative* market value. Even if the buildings and equipment are completely worthless, the land must surely be worth *something*. But there is a deeper point. It cannot be correct that, even if a farm could have a negative market value, any plan of reorganization whereby the bankrupt debtor contributed a penny or more to the operation of the farm could be crammed down the throats of the unsecured creditors. See, e.g., *In re AG Consultants Grain Division, Inc.*, 77 B.R. 665, 678 (Bankr.N.D.Ind.1987). A merely nominal benefit would not be commensurate with the cost to those creditors of giving up the benefits, slight though they may turn out to be, of a liquidation, in which the land and other assets would be sold at auction and might fetch a higher price than anyone had expected.

The contribution that the Stegalls propose to make to the operation of the farm, minus their labor, appears to be nominal. Of the $24,000 offered by them, $22,000 represents the value of the crops that the Stegalls planted *after* they went bankrupt. Those crops, plus the support payments to which they entitle the grower, are the property of the bankrupt estate, see, e.g., 11 U.S.C. § 541(a)(7), and so cannot be contributed to it as new capital. Cf. *In re Sawmill Hydraulics, Inc.*, 72 B.R. 454, 457 (Bankr.C.D.Ill.1987). The point has practical—or if one prefers, equitable—as well as legal significance. If the Stegalls had abandoned the farm, the creditors could have sold it or cash-rented it; either way the creditors would have obtained the value of the crops grown on it, minus the labor costs of growing. The Stegalls do not intend to work for nothing. The $22,000 that they propose to contribute to the estate in respect of the crops is over and above the revenues—$1,000 a month—that they have allotted to themselves as wages. The laborer is worthy of his hire, but the applica-

tion of that adage in this case means that the $22,000 that the Stegalls propose to contribute to the estate approximates what the estate would have obtained without the Stegalls' help, simply by hiring another farmer to grow the crops or by renting or selling the farm. (Maybe it would have obtained a little less: $1,000 a month is a low wage for two farm workers.) If the Stegalls had proposed to work for nothing, and thus to contribute their entire labor to the estate, *Ahlers* would not necessarily require that this contribution be disregarded. The Stegalls' labor would be embodied in the crops; it would no longer be a promise of future labor. But that was not the proposal. The proposed contribution as we have said is a contribution of property already owned by the estate and salable by it at approximately the amount of the contribution. Maybe the contribution is more, because the Stegalls are working for below-market wages, but there is neither evidence nor argument on this point.

The $2,000 in quantified new capital contributed to the farm is too little to warrant the drastic remedy of a cram-down. Cf. *In re Rudy Debruycker Ranch, Inc.*, 84 B.R. 187, 190 (Bankr.D.Mont.1988). Cram-down comes into play only when a substantial minority of creditors are dissatisfied with the plan of reorganization and want to pursue their other remedies. (If more than one-half of the creditors, holding at least two-thirds of the total unsecured debt, approve the plan, it goes into effect automatically. See 11 U.S.C. § 1126(c).) So drastic an interference with property rights is not warranted in a case such as this where the contribution that the debtor proposes to make to the enterprise is nominal and he argues that that is good enough because the part of the estate that he seeks to retain—here, most of the estate—is worthless. If the contribution is nominal, the protesting creditors can hardly be thought duly compensated for surrendering against their will their remedies of foreclosure and forced sale, meager as those remedies may turn out to be if the value of the bankrupt estate is small relative to the secured debt.

Sympathetic to the plight of bankrupt farmers (more precisely, *already* bankrupt

farmers, for, as we have noted in previous decisions, statutes that confer rights on debtors drive up interest rates, see *In re Patterson*, 825 F.2d 1140, 1142 (7th Cir. 1987); *In re Erickson*, 815 F.2d 1090, 1094 (7th Cir.1987); *In re Lindsey*, 823 F.2d 189, 192 (7th Cir.1987)), Congress recently enacted Chapter 12 of the Bankruptcy Code, a special and especially lenient provision applicable only to farmers. 11 U.S.C. §§ 1201 *et seq.* The Stegalls concede that a Chapter 11 proceeding pending when Chapter 12 was enacted cannot be converted into a Chapter 12 proceeding, see Bankruptcy Judges, United States Trustees and Family Farmer Bankruptcy Act of 1986, § 302(c), Pub.L. No. 99–554, 100 Stat. 3088; *In re Erickson Partnership*, 856 F.2d 1068 (8th Cir.1988), so whether it can or not is another issue that we need not resolve today.

AFFIRMED.