In re Delbert SNYDER and Deanna Snyder, Debtors/Appellants.

In re Robert SNYDER, Debtor/Appellant.

Nos. 90–1012, 90–1013.

United States District Court, C.D. Illinois, Peoria Division.

Oct. 30, 1990.

Douglas R. Lindstrom, Galesburg, Ill., for Farm Credit Bank of St. Louis.

Gregg N. Grimsley, Peoria, Ill., for debtors.

## ORDER

MIHM, Chief Judge.

Before the Court is an appeal of the Debtors (#1) from an order of the bankruptcy court which sustained the objection of Farm Credit Bank of St. Louis to the amended disclosure statement filed by the Debtors and which ordered that the Chapter 11 proceedings then pending would be dismissed within 30 days if no further amended disclosure statement and plan were filed. The order of the bankruptcy court is affirmed.

## BACKGROUND

Debtors Delbert Snyder, Deanna Snyder, and Robert Snyder ("the Debtors") are engaged in a joint farm operation known as "Snyder Brothers." Delbert and Robert are brothers. Delbert and Deanna Snyder filed a petition for relief under Chapter 11 of the United States Bankruptcy Code, 11 U.S.C. § 1101 *et seq.*, on June 17, 1988. Robert filed a similar but separate petition on the same day. Although some of the liabilities and assets of the Debtors are not in common, the principal assets and liabilities of the Debtors are identical.

As of the date of filing bankruptcy, the Debtors owed the Farmers Home Administration ("FHA") the approximate sum of $284,000. The FHA had a lien on the Debtors' jointly owned machinery, which the Debtors valued at $118,650. The Debtors owed to Delbert and Robert Snyder's father, Allen Snyder, the amount of $126,794, which is secured by vehicles having a fair market value of $20,000. The Debtors owed Delbert Wright $20,000, which was

unsecured. The Debtors owed the Farm Credit Bank of St. Louis $1,481,635, which was secured by a first mortgage on all 509.6 acres of their jointly owned farm land.

Delbert's bankruptcy schedules show secured debts totaling $1,903,622, unsecured debt of $23,754, and property totaling $687,896, of which $581,000 is attributable to real estate. Robert's schedules show secured debt of $1,891,622, unsecured debt of $21,608, and property totaling $659,047, of which $569,700 is attributable to real estate. Included in these figures are the joint debt of $126,794 owed to their father and the $1,481,635 due the Farm Credit Bank of St. Louis.

The original plans of reorganization provided that the Debtors would retain the jointly owned farm land, write down the bank's secured debt to the value of the farm land, and pay unsecured creditors 10%. In return for this, their father would release his claims. The Bank filed an objection to the Debtors' original disclosure statements and filed motions to dismiss the chapter 11 proceedings. The basis for the objections and the motions to dismiss were the same. The Bank contended that the plans failed to meet the requirements of the absolute priority rule found in 11 U.S.C. § 1129(b)(2)(B)(ii), in that unsecured creditors would only be receiving 10% while the Debtors retained their farm. The Debtors responded by contending that they came within the "fresh capital exception" to the absolute priority rule by making a fresh capital contribution of $30,000 to their father's release of his secured claim valued at $20,000 and his unsecured claim of approximately $100,000, which equates to a $10,000 savings under the plan. The Bank countered by arguing that the fresh capital exception was eliminated with the adoption of the 1978 Bankruptcy Code and by arguing that, even if the fresh capital exception was still viable, the $30,000 did not constitute a fresh capital contribution.

The bankruptcy court considered two issues: (1) is the fresh capital exception to the absolute priority rule still viable under the Bankruptcy Code? and (2) if so, did the

father's release of his claims constitute a contribution of fresh capital. In *In re Snyder*, 99 B.R. 885 (Bankr.C.D.Ill.1989), the bankruptcy court held that the fresh capital exception to the absolute priority rule was still viable, but that the father's release of his claims did not constitute a contribution of fresh capital.

The Debtors then filed amended disclosure statements and plans of reorganization. They now propose as follows:

1. To pay unsecured creditors from future earnings 10% of their claims, without interest, at the rate of 1% per year for 10 years.
2. To contribute (upon confirmation) the sum of $30,000. The source of this contribution will be a gift from a third party.
3. To provide the use of machinery free and clear of their father's lien.
4. To pay the value of the machinery, $20,000, to unsecured creditors over a period of five years.

The Farm Credit Bank of St. Louis again objected on the basis that it controls the unsecured creditor class and will not vote for confirmation unless it is paid in full. The Bank argued that the amended plan was basically the same plan as was proposed before and which was rejected for failure to comply with the absolute priority rule.

In response, the Debtors argued that there was compliance with the fresh capital exception to the absolute priority rule because a $30,000 cash contribution was being made and because the unsecured creditors would receive the value of the machinery, $20,000, over a five year period.

The bankruptcy court again held that the fresh capital exception to the absolute priority rule was still viable under the Bankruptcy Code of 1978 for the reasons stated in its previous opinion. *See, In re Snyder*, 99 B.R. at 886–889. The court then held that the Debtors' plan failed to comply with the fresh capital exception.

## STATEMENT OF ISSUES

1. Does the Debtors' proposed capital contribution conform to the "fresh capital

contribution exception" to the "absolute priority rule"?

2. Did the enactment of the Bankruptcy Code of 1978 eliminate the pre-Code judicial doctrine which allowed a "fresh capital exception" to the "absolute priority rule"?

## DISCUSSION

Chapter 11 of the Bankruptcy Code provides a method by which creditor's rights may be modified under a plan confirmed by the court. Section 1129 of the Code sets forth the requirements for plan confirmation. Section 1129(a)(8) provides that, with regard to impaired classes, the plan may be confirmed only if the class has accepted the plan. A plan is accepted by creditors in an impaired class if the plan receives the favorable vote of one-half of the voting claimants whose claims amount to two-thirds of the claims represented by those voters. 11 U.S.C. § 1126(c).

Under 11 U.S.C. § 1129(b)(1), if all of the elements required for confirmation other than the requirements in § 1129(a)(8) are present, the court must confirm the plan if it does not discriminate unfairly and it is fair and equitable to each class of claims which have not accepted the plan. In order to be confirmed under § 1129(b)(1), the plan must satisfy the requirements of 11 U.S.C. § 1129(b)(2)(B). This section states that the conditions of the plan must be fair and equitable and includes the following requirements:

(B) With respect to a class of unsecured claims—

(i) the plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or

(ii) *the holder of any claim or interest that is junior to the claims of such class will not receive or retain on account of such junior claim or interest any property.*

11 U.S.C. § 1129(b)(2)(B) (emphasis added).

■ The alternative requirements of subsection (ii) are referred to as the "absolute priority rule." This provision had its origins in the case of *Northern Pacific Railway Company v. Boyd*, 228 U.S. 482, 33 S.Ct. 554, 57 L.Ed. 931 (1913). The United States Supreme Court held that the plan of reorganization in that case did not meet the statutory requirements for confirmation because the shareholders of the insolvent corporation retained their rights while the creditors of the corporation had not been paid in full. Under the absolute priority rule, if an unsecured class will receive less than the full value on the allowed amount of its claims, then the debtor, as a junior claim holder, may not receive or retain any claim or any interest in any property under the plan. *In re Potter Material Service, Inc.*, 781 F.2d 99, 101 (7th Cir.1986). In other words, absent the consent of the unsecured creditor class, the debtor may retain nothing unless the unsecured creditors are paid in full.

Courts applying the absolute priority rule under the Bankruptcy Act have, in the past, recognized an exception to the rule. This judicially-created doctrine held that the owner of an interest could retain that interest if he contributes sufficient new capital to the reorganized entity. *See, Case v. Los Angeles Lumber Products Company, Ltd.*, 308 U.S. 106, 60 S.Ct. 1, 84 L.Ed. 110 (1939).

In *Norwest Bank Worthington v. Ahlers*, 485 U.S. 197, 108 S.Ct. 963, 99 L.Ed.2d 169 (1988), the United States Supreme Court declined to rule on whether the "fresh capital exception" to the "absolute priority rule" survived the enactment of the 1978 Bankruptcy Code as the Court found that, even if the fresh capital exception still existed, the exception did not include the respondent's promise to contribute their labor, experience, and expertise to the reorganized enterprise. 485 U.S. at 203, n. 3, 108 S.Ct. at 967, n. 3. Similarly, in *In re Stegall*, 865 F.2d 140 (7th Cir. 1989), the Seventh Circuit held that even if there was a fresh capital exception to the absolute priority rule, the debtor's proposed contribution of labor in working on their farm did not constitute such capital. 865 F.2d at 142–144. In *Stegall*, the Seventh Circuit expressly declined to rule on

the continued viability of the fresh capital exception rule, expressly noting that "the issue is an open one in this Circuit." *Id.* at 142.

In light of the reluctance of the Seventh Circuit and Supreme Court to rule on whether the fresh capital exception still exists, this Court will first consider whether or not the Plaintiff's proposed contribution meets the requirements of the fresh capital exception as it has been defined by the courts.

■ To determine whether the debtors in a particular case have met the requirements of the fresh capital exception, courts generally require that the capital contribution (1) represent a substantial contribution of new capital, (2) equal or exceed the value of the retained interest, and (3) be essential to the success of the undertaking. *See, Case v. Los Angeles Lumber Products Company, Ltd.*, 308 U.S. 106, 121, 60 S.Ct. 1, 10, 84 L.Ed. 110 (1939); *In re Potter Material Service, Inc.*, 781 F.2d 99, 101 (7th Cir.1986); *In re Olson*, 80 B.R. 935, 937 (Bankr.C.D.Ill.1987), *aff'd on appeal*, slip op. 88–4052, 1989 WL 330439 (C.D.Ill., Feb. 8, 1989); *In re Landau Boat Company*, 13 B.R. 788, 792–793 (Bankr. W.D.Mo.1981); *In re Marston Enterprises*, 13 B.R. 514, 518 (Bankr.E.D.N.Y.1981).

■ The initial question in this case is whether the Debtors' current proposal to pay creditors the $20,000 value of the machinery with their father releasing his lien and claims is sufficient to constitute "new" or "fresh capital." This Court does not believe that this is sufficient. As the bankruptcy court found, the investment must be "up front" and cannot be in the form of future payments from the operation of the farm. *In the Matter of Stegall*, 85 B.R. 510 (C.D.Ill.1987), *aff'd on appeal*, 865 F.2d 140 (7th Cir.1989); *In re Olson*, 80 B.R. 935; *see also, In re Pecht*, 57 B.R. 137 (Bankr.E.D.Va.1986). The Debtors' proposal fails to meet this standard because the payments will not be "up front," but rather future payments from the farm's operation. Furthermore, as was stated in the bankruptcy court's previous opinion of *In re Snyder*, 99 B.R. at 889–90:

There is, however, a more basic consideration. In *Case v. Los Angeles Lumber Products Company Ltd.* [308 U.S. at 117–118, 60 S.Ct. at 8–9], a cash contribution was being made, and the court, in analyzing the issue, quoted from *Kansas City Terminal Railway Company v. Central Union Trust Company*, 271 U.S. 445 [46 S.Ct. 549, 70 L.Ed. 1028] (1926), as follows:

Generally, additional fund will be essential to the success of the undertaking, and it may be impossible to obtain them unless stockholders are permitted to contribute and retain an interest sufficiently valuable to move them. In such or similar cases the chancellor may exercise an informed discretion concerning the practical adjustments of the several rights.

Later on, the court in *Case* [308 U.S. at 121–122, 60 S.Ct. at 10], stated as follows:

It is, of course, clear that there are circumstances under which stockholders may participate in a plan of reorganization of an insolvent debtor. This court, as we have seen, indicated as much in *Northern Pacific Railway Company v. Boyd*, supra, and *Kansas City Terminal Railway Company v. Central Union Trust Company*, supra. Especially in the latter case did this court stress the necessity, at times, of seeking new money "essential to the success of the undertaking" from the old stockholders. Where that necessity exists and the old stockholders make a fresh contribution and receive in return a participation reasonably equivalent to their contribution, no objection can be made. But if these conditions are not satisfied the stockholder's participation would run afoul of the ruling of this court in *Kansas City Terminal Railway Company v. Central Union Trust Company*, supra, that "whenever assessments are demanded, they must be adjusted with the purpose of according to the creditor his full right of priority against the

corporate assets, so far as possible in the existing circumstances."

The essence of the fresh capital exception, taking from the early cases, is that money or something in money's worth must be contributed. A forgiveness of debt is only an accounting entry which affects just the liability side of the balance sheet and creates no new funds. While it may lessen the darkness of a dismal picture, it does little to enhance the debtor's prospects of reorganization. This much was insinuated by the Supreme Court in *Case* [308 U.S. at 122–123, 60 S.Ct. at 10–11], where the Court, in holding that the stockholders "influence in the community" and "continuity of management" did not constitute a capital contribution, stated:

> Such items, on facts present here, are not adequate consideration for the issuance of the stock in question. On the facts of this case they cannot be translated into money's worth reasonably equivalent to the participation accorded to the old stockholders. They have no place in the asset column of the balance sheet of the new company.

This court concludes that the forgiveness of debt by the Debtors' father does not constitute a fresh capital contribution as it is not an "up front" contribution. The value of the contribution will only be realized in the future through the use of the father's machinery. Further, this Court believes that this conclusion is consistent with recent case law. *See also, Norwest Bank,* 485 U.S. at 203, n. 3, 108 S.Ct. at 967, n. 3; *In re Stegall,* 865 F.2d at 142–144.

■ The next issue is whether or not the $30,000 cash contribution from a third party constitutes a "substantial contribution" of fresh capital.

The Debtors contend that the key element of the fresh capital exception as created by *Case* was that the shareholder's contribution must be "reasonably equivalent" to the value they retained. *Case,* 308 U.S. at 121, 60 S.Ct. at 10. The Debtors

note that *Case* did not include a requirement that the contribution be "substantial." However, as the Debtors concede, the Seventh Circuit has held that new capital must "(1) represent a substantial contribution, and (2) equal or exceed the value of the retained interest." *In re Potter Material Service, Inc.,* 781 F.2d 99, 101 (7th Cir.1986). Thus, the Debtors must show that they have made a substantial capital contribution.

The Debtors assert that the court in *Potter* did not define "substantial," but did provide guidance by comparing the contribution proposed against the going-concern value of the debtor and not against the amount of unsecured indebtedness being discharged (as the bankruptcy court did in this case [1]). The Debtors contend that the proper standard for comparison is the value of the interest retained and not the amount of the unsecured debt. They assert that most courts which have examined the question to determine what the contribution should be compared to have looked to the value of the interest retained and not the indebtedness discharged. Peeples, Ralph A., *Staying In: Chapter 11, Closed Corporations and the Absolute Priority Rule,* 63 Am.Bkrtcy.L.J., 65, 83, n. 146 (1989). Because evidence of valuation is required to compare the contribution of the debtors to the interest retained by the debtor, the Debtors assert that the bankruptcy court should be required to consider more evidence regarding the valuation of the interest retained by the Debtors.

> In *Potter* the Seventh Circuit stated that:
> The district court found that Ochstein's investment was substantial *and* greater than the value of the interest he received in Potter (i.e., the going concern value of Potter).

*In re Potter,* 781 F.2d at 102 (emphasis added). The *In re Potter* court went on to recite the contributions made by the debtor, and then, discussed the arguments in the case.

The court first discussed whether or not the debtor's contribution was "new." The

---

1. The bankruptcy court expressly noted that, "the $30,000 fresh capital contribution amounts

to just 2.7% of the approximately $1,100,000 due unsecured creditors."

court considered the argument by the unsecured creditor's class that Ochstein's renewal of his personal guarantee of Potter's debt of $600,000 debt to Merchants Bank was not "new" or "substantial" consideration. The Seventh Circuit affirmed the district court and bankruptcy court in finding that the "renewal of the personal guarantee was an economic risk of indeterminable value and thus consideration toward the purchase of Potter's stock." *Id.* at 103.

However, the court did not directly discuss whether or not the personal guarantee combined with the other contributions made by the debtor were substantial. The court only went on to discuss the other arguments by the unsecured creditor's class regarding whether or not the bankruptcy court erred by placing too low a value on the interest which Ochstein received in Potter, the debtor, and whether or not the district court erred in accepting a going-concern value for Potter which the creditors argued understated the real value Ochstein received. Thus, the *Potter* court did not directly compare the contribution proposed against the going-concern value of the debtor in determining the substantiality of the debtor's contribution. Also, the court never ruled on the proper standard to be used in determining the substantiality of the contribution.

This Court disagrees with the Debtors' assertion that most courts which have examined the question have concluded that the contribution should be compared to the value of the interest retained and not the indebtedness discharged. The portion of the article cited by the Debtors found that many courts, in order to determine whether a contribution from the old shareholders was "reasonably equivalent" in value to the future participation of the old shareholders, have reworked this requirement into a test that is satisfied only if the value of the proposed contribution is equal to or greater than the value of the interest to be retained by the old shareholders. *Id.* On page 90 of the same article the author, Peeples, discusses the requirement that a contribution be "substantial" independent of the requirement that it be "reasonably equivalent" in value. Peeples notes that in

several cases the "substantial" requirement in effect substitutes for the "reasonably equivalent" requirement. *See, Marston Enterprises,* 13 B.R. at 514; *Landau Boat,* 13 B.R. at 788. Peeples goes on to state:

> A comparison and a valuation is still necessary. The need for such a comparison leads to a new dilemma: compared to what? Should the contribution be compared to the value of the interest sought to be retained, or to the amount of outstanding unsecured claim? For most courts, the answer has been the former.

63 Am.Bkrtcy.L.J. at 90.

Although *Marston* and *Landau Boat* suggest that the substantial requirement in effect substitutes for the reasonably equivalent requirement, those cases did not directly rule on the point regarding whether or not the contribution must be compared only to the value of the interest sought to be retained or only to the amount of the outstanding secured claims. Furthermore, although Peeples suggests that most courts have found that the contribution should be compared to the value of the interest sought to be retained, he cites no case law supporting that point. However, Peeples did note that one court rejected a proposed $50,000 cash contribution from the old owners on the ground that it was "de minimis" compared to the unsecured claims, which exceeded $1,200,000. *See, In re Rudy Debruycker Ranch, Inc.,* 84 B.R. 187, 190 (Bankr.D.Mont.1988). The Seventh Circuit has cited this case approvingly. In *Stegall* the Seventh Circuit stated:

> The $2,000 in quantified new capital contributed to the farm is too little to warrant the drastic remedy of a cram-down. *Cf. In re Rudy Debruycker Ranch, Inc.,* 84 B.R. 187, 190 (Bankr.D.Mont.1988). Cram-down comes into play only when a substantial minority of creditors are dissatisfied with the plan of reorganization and want to pursue their other remedies. (If more than one-half of the creditors, holding at least two-thirds of the total unsecured debt, approve the plan, it goes into effect automatically. *See,* 11 U.S.C. § 1126(c)). So drastic an interference

with property rights is not warranted in a case such as this where the contribution that the debtor proposes to make to the enterprise is nominal and he argues that that is good enough because the part of the estate that he seeks to retain—here, most of the estate—is worthless. *If the contribution is nominal, the protesting creditors can hardly be thought duly compensated for surrendering against their will their remedies of foreclosure and forced sale, meager as those remedies may turn out to be if the value of the bankrupt estate is small relative to the secured debt.* *In the Matter of Stegall,* 865 F.2d 140, 144 (7th Cir.1989). The language in the *Stegall* case clearly seems to approve comparing the contribution to the amount of the outstanding unsecured claim where the contribution is nominal. As the bankruptcy court noted, $30,000 fresh capital contribution in this case amounts only to just 2.7% of the approximately $1,100,000 due to unsecured creditors, and just 3.3% due to the Bank on the unsecured portion of its claim. *In re Snyder,* 105 B.R. 898, 902–03 (Bankr.C.D.Ill.1989). The bankruptcy court concluded that "[t]he capital contribution which relates to unsecured creditors in such a fashion cannot be considered substantial." *Id.*

■ This Court finds that the bankruptcy court properly considered whether the Debtors' contribution was substantial by comparing the Debtors' contribution to the amount of the outstanding unsecured claims; consequently, this Court finds that it was not necessary for the bankruptcy court to obtain further evidence regarding the valuation of the interest retained by the Debtors.

■ The Debtors also object to the finding of the bankruptcy court that the amended plan was not confirmable because the amended bankruptcy plan was not viable in light of the Debtors' lack of financial strength (the bankruptcy court found that, if the plan was adopted, it would likely be followed by a liquidation). The Debtors assert that, because the viability issue was not presented in the Bank's motion to dismiss and objection to the amended disclosure statement, no viability testimony was offered at that stage of the proceeding. The Debtors contend that these issues are typically litigated at the hearing on confirmation and not on a hearing on the adequacy of the disclosure statement.

This Court agrees with the Debtors' contention that the bankruptcy court improvidently considered the viability of the Debtors under the amended bankruptcy plan without allowing for evidence on that issue. However, this Court would note that the viability of the bankruptcy plan only relates to the issue of whether the fresh capital contributed by the Debtors would make the Debtors' bankruptcy plan viable. That is an issue which is completely separate from the question which would have to precede it, i.e., should the bankruptcy plan be approved where the Debtors' contribution was not substantial. As stated earlier, the Seventh Circuit has noted that the drastic remedy of a cram-down will not be forced on the creditors where the contribution by the debtor is nominal. *Stegall,* 865 F.2d at 144.

Further, because the Debtors' proposed contribution does not meet the requirements of the "fresh capital exception" to the "absolute priority rule," it is unnecessary to consider whether or not the Bankruptcy Code of 1978 eliminated the "fresh capital exception." *See, Norwest Bank,* 485 U.S. at 203, n. 3, 108 S.Ct. at 967, n. 3; *Stegall,* 865 F.2d at 142–144.

## CONCLUSION

For the reasons given herein, the order of the bankruptcy court is AFFIRMED and the appeal by the Debtors is DISMISSED.