In re Edwin R. BOLTON, d/b/a Derby Line Health Center, P.C., Debtor-in-possession.

Bankruptcy No. 95–10203 FGC.

United States Bankruptcy Court, D. Vermont.

Nov. 28, 1995.

his law firm, was able to bring about the negotia-
tion of the consensual plan.

914

R. Scholes, Law Offices of R.A. Scholes, Montpelier, VT, for Edwin R. Bolton.

K. Purcell, Office of U.S. Trustee, for U.S. Trustee.

## MEMORANDUM DECISION DENYING CONFIRMATION

FRANCIS G. CONRAD, Bankruptcy Judge.

Debtor seeks [1] confirmation of his Chapter 11 plan by utilizing the cramdown provision of § 1129(b).[2] He resorts to this procedure because the class of general unsecured creditors ("Class 15") voted against his plan. And, although there were no objections to confirmation, we still must be satisfied that the plan is in conformity with § 1129. *In re AG Consultants Grain Division, Inc.*, 77 B.R. 665, 667 (Bkrtcy.N.D.Ind.1987). We find that it is not. The plan violates the absolute priority rule, and does not fit within the "new value" exception to that rule.

## BACKGROUND

Debtor is a practicing physician, operating under the aegis of his professional corporation, Derby Line Health Center, P.C. (DLHC). He is the sole practitioner in

---

1. Our subject matter jurisdiction over this controversy arises under 28 U.S.C. § 1334(b) and the General Reference to the Court under Part V of the Local District Court Rules for the District of Vermont. This is a core matter under 28 U.S.C. § 157(b)(2)(A). This Memorandum of Decision constitutes findings of fact and conclusions of law under F.R.Civ.P. Rule 52, as made applicable by Fed.R.Bkrtcy.P. Rule 7052.

2. Unless otherwise specifically indicated, all statutory references are to Title 11 of the United States Code.

DLHC, working only 32 hours per week and doing "occasional medical-legal consulting." Debtor's financial affairs have been shaky since 1985 when, after a divorce, he was treated for depression and substance abuse. From 1985 to 1988, he did not practice medicine but instead, relied mostly on $3000 per month in disability benefits from his insurance carrier to help with his expenses. Debtor also received (and still receives) approximately $3000 per month in rental income from his former first home, which he had converted into office and apartment space. The conversion renovations, made between 1985 and 1988, were financed with unsecured credit. In 1990, he financed improvements on his second home for a new spouse and family with credit cards and home equity loans. These debts, along with his recent divorce from the former new spouse, have forced him to seek the protection of the Bankruptcy Code.

DLHC pays Debtor $2000 per month for rent of office space in Debtor's converted former home. DLHC barely produces enough income to cover this rent and its expenses. Debtor's profit and loss statement for the business shows erratic income flows— some month's losses are as much as $5000 and other month's profits can reach $8000. His yearly projections show a total annual profit of $19,000. Debtor maintains this unpredictable practice, however, in order to continue receiving disability benefits; his receipt of benefits is contingent upon his continuing the practice of medicine. Although the benefits ceased for two months in the recent past, Debtor's disclosure statement assures us that he is receiving and will continue to receive about $3000 a month for the duration of the plan.

Debtor proposes a monthly plan contribution of $3460. Approximately 90% of these payments will come from Debtor's otherwise exempt disability benefits. Debtor's other source of income, the $3000 per month rental income, will be used to cover his living expenses and payments outside of the plan. His rental space has the capability of bringing in $3600 per month, but is usually substantially reduced due to "vacancies and maintenance." The vacancies most likely refer to the apartment space that brings in approximately $1000 per month and not DLHC that regularly pays Debtor $2000 per month.

Class 15, consisting mostly of credit card debt, has voted to reject the plan, which proposes a 34% dividend for them.[3] No objections to confirmation were filed.

## ISSUE

Debtor seeks to retain the approximately $118,000 worth of non-exempt equity in his property that would be available to creditors if he were to liquidate. The bulk of this equity is in his DLHC office space and equipment. Unquestionably, Debtor's plan violates the absolute priority rule, § 1129(b)(2)(B), by allowing Debtor to retain this equity without creditors being paid in full. His creditors have not accepted the plan. He thus seeks to cram down the dissenting unsecured class under § 1129 of the Bankruptcy Code. To allow cramdown, we must determine if the plan is confirmable despite the violation of the absolute priority rule. More specifically, we must decide if the plan satisfies the "new value" exception to the absolute priority rule.

## DISCUSSION

We have an independent duty to ensure that a plan satisfies all of the elements of § 1129 before ordering confirmation even though no objections were filed. 11 U.S.C. § 1129; *In re AG Consultants, supra,* 77 B.R. at 667; *In re Egan,* 142 B.R. 730, 733 (Bkrtcy.E.D.Pa.1992). Although, as Debtor concedes, the plan violates the absolute priority rule, we must determine whether the plan is saved by the "new value" exception, assuming the exception exists.

---

**3.** The Town of Derby also voted to reject the plan. Their claims will be satisfied under § 1129(a)(9)(C).

In 1939, the Supreme Court laid out a scenario whereby debtors could retain an interest in their reorganized businesses if they contributed "new value" in exchange for that retained interest. *Case v. Los Angeles Lumber Products Co.*, 308 U.S. 106, 123, 60 S.Ct. 1, 10, 84 L.Ed. 110 (1939). The "exception" logically permits transactions that are more akin to purchases of or investments in the newly reorganized business, rather than mere equity retention. Although the exception was "created" in *dicta* in *Case*, it has been oft cited and followed in the ensuing decades. *See, e.g. Norwest Bank Worthington v. Ahlers*, 485 U.S. 197, 108 S.Ct. 963, 99 L.Ed.2d 169 (1988); *Bonner Mall Partnership v. United States Bancorp Mortgage Co.*, 2 F.3d 899 (9th Cir.1993), *cert. granted*, —— U.S. ——, 114 S.Ct. 681, 126 L.Ed.2d 648 (1994), *vacated as moot*, —— U.S. ——, 115 S.Ct. 386, 130 L.Ed.2d 233 (1994); and *See also In re AG Consultants, supra*, 77 B.R. at 677, for a more thorough listing of decisions following *Case*'s *dicta*.

Although most courts recognized the new value exception after the Supreme Court decided *Case* in 1939, there is considerable debate over whether this judicially created exception survived the enactment of the Bankruptcy Code in 1978. *See generally The New Value Exception to the Chapter 11 Absolute Priority Rule*, D.S. Neville, 60 Mo. L.Rev. 465 (1995); *Rethinking Absolute Priority After Ahlers*, J.D. Ayer, 87 Mich.L.Rev. 963 (1989). The question arises because the judicially created "absolute priority rule" was codified in § 1129(b)(2)(B) but the "new value exception" was not mentioned. There is no legislative history that conclusively tells us whether this omission was intentional. Therefore, as can be expected, the courts are split according to their various methods of statutory construction and interpretation. The Ninth Circuit is the only Circuit to resolve this dispute among lower courts; it found that the new value exception survived the Code's enactment. *Bonner Mall, supra*,

2 F.3d at 917–918. Many other courts have assumed, solely for argument's sake, that the exception does exist and have found that the plans at issue did not meet the exception's rigid requirements. *See e.g., In re Snyder*, 967 F.2d 1126, 1129 (7th Cir.1992); *In re Hickey Properties, Ltd.*, 1995 WL 264023, *4 (Bkrtcy.D.Vt.1995).

■ At the risk of being likened to a certain species of poultry, we find it unnecessary to boldly hold, upon the facts before us, that the exception survives. Preferring to be discreetly valorous, we hold that the facts compel the conclusion that even if the exception did survive, Debtor has not met its requirements. The new value exception, as described in *Case*, requires that the new contribution be (1) new, (2) substantial, (3) money or money's worth, (4) necessary for a successful reorganization and (5) reasonably equivalent to the value or interest received. *Bonner Mall, supra*, 2 F.3d at 908, *citing Case, supra*, 308 U.S. at 121–122, 60 S.Ct. at 9–10. Debtor, while unprecedentedly [4] close to satisfying the new value exception in an individual Chapter 11, fails the third requirement—"money or money's worth"—outright, and the first requirement—"new"—by analogy.

In describing "money or money's worth," *Case* rejected the idea of a contribution of management services to the new business because such services have "no place in the asset column of a balance sheet." *Case, supra*, 308 U.S. at 122, 60 S.Ct. at 10. In *Ahlers*, the Supreme Court reemphasized this criterion by disallowing the contribution of "sweat equity" to the reorganization process because it is not alienable or of value to the creditors immediately upon confirmation. *Ahlers, supra*, 485 U.S. at 204, 108 S.Ct. at 967.

■ Lower courts have interpreted both Supreme Court opinions as requiring contributions to be "up front" or "liquidable." *See*,

---

4. We have found no cases where an individual Chapter 11 debtor has proposed a plan which is funded almost entirely from exempt assets and which proposes to pay a substantial percentage to the unsecured creditors.

*In re Stegall*, 865 F.2d 140, 142 (7th Cir. 1988); *In re Kovalchick*, 1995 WL 118171, *5 (Bkrtcy.E.D.Pa.1995); *In re Hendrix*, 131 B.R. 751, 753 (Bkrtcy.M.D.Fl.1991); *In re Olson*, 80 B.R. 935, 937 (Bkrtcy.C.D.Ill.1987), *aff'd*, 1989 WL 330439 (C.D.Ill.1989).[5] It is "settled law that a promise to pay future income is not 'new value'." *In re Woodmere Investors Limited Partnership*, 178 B.R. 346, 363 (Bkrtcy.S.D.N.Y.1995). Similarly, the Ninth Circuit, in a well-reasoned opinion, rejected a Debtor's promise to offer either future salary or rental income as a plan contribution simply because the payments would be made in the future and could not be exchanged in any market at the time of confirmation. *In re Boyd*, 15 F.3d 1089 (table), 1993 WL 533471, *2 (9th Cir.1993).[6]

Debtor's plan proposes to pay the unsecured creditors, over approximately 5½ years, the value of the non-exempt equity Debtor wishes to retain. The payments to general unsecured creditors, which will not even commence for 23 months, will amount to approximately the present value of what they would have received upon liquidation after priority claims were paid, or $48,377. This is roughly 34% of the debt owed to them. While we agree with Debtor that this is a substantial percentage return for Chapter 11 general unsecured payments, it still does not satisfy the criterion of "money's worth" defined above because the payments will be made in the future, instead of being available now in a liquidation.

Future payments derived from services are also problematic, not just because they are to be made in the future, but simply because they are derived from services. In *In re Stegall*, 865 F.2d 140 (7th Cir.1989), the court, like *Ahlers*, disallowed the promise to contribute labor as "new value." *Stegall*,

*supra*, 865 F.2d at 142. The court explained that such a promise would be unenforceable upon any later default by the debtor because the Thirteenth Amendment prohibits specifically enforcing the promise of work. *Id.* It questioned the fairness of allowing the debtor to retain a leviable asset—the non-exempt equity—in exchange for a non-leviable asset—labor. *Id.* If the business continues on its same course, it will likely fail, causing a conversion to Chapter 7, and at that point provide less to its creditors. *Id.*

In this case, although Debtor has not specifically offered labor as a "new value" contribution, his ability to contribute is contingent upon his continuing moil. If he were to discontinue the practice of medicine, his disability payments would cease. No creditor could force him to continue practicing. In the meantime, his business property and equipment may have depreciated considerably. Thus, there is no protection for Debtor's creditors.

█ In addition to the violation of the criterion "money's worth," Debtor's plan violates the spirit of the "new" requirement, if not the commands. "New" contributions are supposed to be from outside of a debtor's business. *In re Zaleha*, 1995 WL 128495, *3 (Bkrtcy.D.Idaho); *In re Cipparone*, 175 B.R. 643, 644 (Bkrtcy.E.D.Mich.1994). While exempt assets such as disability payments would seem to be ordinarily outside of a debtor's business, Debtor's disability payments, as just noted, are not entirely separate from his business. The payments are analogous to business income because they are contingent upon the success of his business. Therefore, Debtor seeks to retain equity in his business property and income by indirectly contributing business income. In fact, the plan would operate no differently if Debtor lived off of his disability benefits (as is the exemption's intent) and contributed his business rental income, which is roughly the

---

**5.** We have found only one reported case where an individual Chapter 11 debtor was able to satisfy the "new value" exception by making future payments. *In re Henke*, 90 B.R. 451, 456 (Bkrtcy.D.Mont.1988). We consider this case an anomaly not only because it is contrary to the bulk of previous and later case law (the case did not even mention the "money's worth" requirement). It is also factually intense because the creditors in that case were being paid 100% of

their claims from a source totally unrelated to the debtor's business. *Id.* The facts in *Henke* make that case inapposite to this one.

**6.** Even though *Boyd* is unpublished and not to be cited as precedent within the Ninth Circuit, we agree with its reasoning and choose to cite it here.

918

same amount, into the plan. This would be a direct violation of the absolute priority rule and would not fit the "new value" exception. *See, e.g. Woodmere Investors, supra,* 178 B.R. at 363, ("rental income from the very asset the Debtor is attempting to keep … cannot be 'new' ").

Finally, we are reticent about confirmation as a practical matter. Debtor's Disclosure Statement contains this comment about his disability payments: "[a]lthough the insurance carrier ceased making payments for two months, negotiations with counsel have convinced the carrier to resume the payments." There is no evidence before us about why the payments ceased or how "convinced" the carrier is to continue making payments. This statement merely serves to thrice remind us that the proposed plan is founded upon a dubious source of funds. Accordingly, we are unable to conclude that "[c]onfirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor …" § 1129(a)(11).

### CONCLUSION

Debtor's proffer of future payments from an uncertain source cannot satisfy the "new value" exception to the absolute priority rule. Accordingly, confirmation is denied.